UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STANLEY MCFADDEN,              )
                               )
    Plaintiff,             )
                               )
v.                             )      Cause No. 4:14-CV-00803-CEJ
                               )
3M COMPANY, et al.             )      **JURY TRIAL DEMANDED**
                               )
    Defendants.            )

## MEMORANDUM IN SUPPORT OF MSA'S MOTION TO DISMISS

Defendant Mine Safety Appliances Company ("MSA") files this memorandum in support of its Motion to Dismiss Plaintiff's Complaint pursuant to FRCP 12(b)(6) because Federal law preempts Plaintiff's state tort claims. In the alternative, Plaintiff's Complaint fails to state a claim on which relief can be granted under Missouri law. In support thereof, MSA states as follows:

## I.  INTRODUCTION

This is a product liability suit alleging that the MSA Dustfoe respirator Plaintiff wore for a short period of time in the 1970s while employed at ISP Minerals in Annapolis, Missouri contributed to cause him to develop silica-induced disease.

Plaintiff alleges that he was continuously exposed to silica dust at ISP. Pursuant to mandatory Occupational Safety and Health Administration (OSHA) regulations, where respirators are required to protect the health of an employee, Plaintiff's employer was required to select and provide an appropriate, Federally approved respirator. The MSA Dustfoe 66 is an air-purifying respirator designed, tested, and approved to provide protection against pneumoconiosis producing dusts, including silica. (SOF ¶13, Exhibit 1-D(vi)) It was tested under government regulatory standards, and received and maintained certification and approval from the relevant agencies for passing these tests, including tests specific to the efficiency of the respirator in preventing the leakage or penetration of

1

contaminated air. The Dustfoe 66 was continually updated and received additional approvals as the Federal regulations were amended and modified.

The Federal government has a long history of regulating the safety, design, and effectiveness of respiratory protective devices, as well as the use of such devices in the workplace. OSHA is the agency responsible for promulgating and enforcing mandatory regulations to promote the safety of workplaces and employees, including the use of Federally approved respirators when conditions require. The Bureau of Mines and the National Institute of Occupational Safety and Health (NIOSH) are the primary agencies that are (or have been) responsible for regulating the testing, certification, and approval of respiratory protective devices.

Plaintiff's claims are based on allegations that the Dustfoe failed to comply with the Federal regulations. While the Dustfoe was always approved under the Federal Regulations, which belies Plaintiff's claims, his claims are preempted as they seek to impose standards on the Dustfoe that are distinct from the mandatory Federal occupational safety or health standards. Congress, under its power to regulate commerce and the general welfare, regulates the standards that Plaintiff seeks to impose.

## II. PLAINTIFF'S ALLEGATIONS

According to the Complaint, Plaintiff Stanley McFadden was employed from August 29, 1973 to 1985 by ISP Minerals ("ISP") in Annapolis, Missouri, where he was continuously exposed to silica dust. (SOF ¶1a-d). Plaintiff alleges that certain respirators he used during this employment failed to properly perform, thereby causing or contributing to cause him to develop silicosis (SOF ¶1e-g). Plaintiff alleges that he used the MSA Dustfoe respirator "in the early part of his work career" and the 3M 8710 and 3M 8715 "throughout the duration of his employment". (SOF ¶1f)

Plaintiff claims against MSA are pled in products liability, negligence, breach of warranty, and negligence *per se*. (Doc #1, Counts II, IV, VII, VIII) This is a products liability suit based on diversity jurisdiction. (*Id*., generally) Plaintiff is, and all relevant times was, a Missouri resident performing work in Missouri. (SOF ¶1a-c)  Therefore, Missouri law applies to Plaintiff's claims.

### III.  ARGUMENT

#### a.  Standard for Motion to Dismiss

In order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937 (2009), citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007). "A claim has facial plausibility when the plaintiff [has pleaded] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In ruling on a motion to dismiss, a court may consider documents that are necessarily embraced by the pleadings.  *Cox v. Mortgage Elec. Registration Sys., Inc.*, 685 F.3d 663, 668 (8th Cir. 2012)

#### b.  Plaintiff's Claims are Preempted by Federal Law

Federal preemption of state law may occur when Congress expressly preempts state regulation, when Congress intends to "occupy the field" regulated, or when state law conflicts with federal law. *Mattingly v. Medtronic*, 468 F.Supp.2d 964, 966 (E.D.Mo 2007), *citing Crosby v. National Trade Council*, 530 U.S. 363, 373, 120. S.Ct. 2288 (2000). Where Federal law expressly preempts state regulation, but also includes a clause saving state tort claims, ordinary principles of conflict preemption, including "frustration of purpose" and impossibility, apply. *Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 870, 873-874, 120 S. Ct. 1913, 1919 (2000).

##### i.    Standard for Preemption Under the OSH Act

When Congress, "through the exercise of its powers to regulate commerce…and provide for the general welfare", enacted the Occupational Safety and Health Act of 1970 ("OSH Act"), it affirmatively declared its intent to occupy, by comprehensive legislation, "occupational safety and health standards applicable to businesses affecting interstate commerce." 29 U.S.C.A. §651(b). The OSH Act authorized the Secretary of Labor to set mandatory occupational safety and health standards, and required that any national consensus standard and any established Federal standard be promulgated

as a mandatory standard unless the Secretary determined such standard would not result in improved safety or health. *Id.*, 29 U.S.C.A. §655.

The OSH Act "does not prevent any State agency or court from asserting jurisdiction over any occupational safety or health issue with respect to *which no [established federal or national consensus] standard is in effect* under [the OSH Act]." 29 U.S.C.A. §667(a) (emphasis added). This provision saving state jurisdiction over occupational safety or health issues with respect to *which no federal standard is in effect* clearly manifests the intent to preempt state jurisdiction over occupational safety or health issues with respect to *which a federal standard is in effect.* However, the OSH Act also provides that "[n]othing in this act shall be construed to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment." 29 U.S.C.A §653(b)(4). As the OSH Act includes both a preemption provision and a savings clause, the ordinary principles of conflict preemption, including frustration of purpose and impossibility, apply. *See Geier,* 529 U.S. at 870 ("It is difficult to understand why Congress would have insisted on a compliance-with-federal-regulation precondition to the provision's applicability had it wished the Act to "save" all state-law tort actions, regardless of their potential threat to the objectives of federal safety standards promulgated under that Act.")

However, the OSH Act allows states the option of avoiding preemption of any occupational safety or health issue with respect to which a Federal standard is in effect by assuming responsibility for the development and enforcement of such standards. 29 U.S.C.A. §667(b).  In order to do so, a state plan for the development and enforcement of such standards must be submitted to and approved by the Federal government. 29 U.S.C.A. §667.  When a proposed state plan includes standards *"applicable to products which are distributed or used in interstate commerce"* distinct from the federal standards, the state plan shall be approved only when such standards *"are required by compelling local conditions and do not unduly burden interstate commerce."* 29 U.S.C.A. §667(c)(2) (emphasis added), *see also*

4

29 C.F.R. §1902.3(c)(2) ("The State plan shall not include standards for products distributed or used in interstate commerce which are different from Federal standards for such products unless such standards are required by compelling local conditions and do not unduly burden interstate commerce.")

Therefore, the question of whether state tort claims involving occupational safety or health issues for a product distributed or used in interstate commerce are preempted can be determined as follows:

1) If the issue is one with respect to which <u>no Federal standard is in effect</u>, claims are not preempted.

2) If the issue is one with respect to which a <u>Federal standard is in effect</u>,

    a. Has the state assumed responsibility for the development and enforcement of such standards for the product at issue under an OSHA approved plan?

        i. If no, claims are preempted if state law conflicts with Federal law under ordinary principles of conflict preemption, including frustration of purpose and impossibility

        ii. If yes, is the state standard at issue distinct or different from the Federal standard?

            1. If no, claims are not preempted;

            2. If yes, claims are preempted unless both the following are true: 1) the state standard 1) is required by compelling local conditions, ***and*** 2) does not unduly burden interstate commerce.

Missouri has not assumed responsibility for the development of occupational safety and health standards under the OSH Act. Therefore, state law claims involving an occupational safety or health issue for a product distributed or used in interstate commerce are preempted if a Federal standard is in effect, and the state standard sought to be imposed by a Missouri tort claim conflicts with Federal law under the principles of conflict preemption, including frustration of purpose and impossibility.

**ii.  Federal Standards Applicable to Plaintiff's Claims are in Effect**

**1. Federal Regulation of Respiratory Protection under the OSH Act**

Pursuant to the directive of the OSH Act, the Secretary of Labor promulgated regulations containing mandatory occupational safety and health standards (29 C.F.R Part 1910, *et seq.* (1974), "the Occupational Safety and Health Regulations"), including those "found to be national consensus standards or established Federal standards." *Id.* at §1910.1. The mandatory respiratory protection

standard is contained in §1910.134.[1] Where respirators are necessary to protect the health of employees, OSHA requires employers to establish and maintain a respiratory protection program and provide employees with a respirator suitable for the purpose intended.  *Id.* at §1910.134(a). At the time period at issue, OSHA required the provision of "approved or accepted" respiratory protection against the particular hazard for which it was designed" in accordance with standards established by the Bureau of Mines and NIOSH. §1910.134(b)(11). Respirators were to be selected pursuant to American National Standard Practices for Respiratory Protection ANSI Z88.2-1969. §1910.134(c). The standards for approval of respirators and ANSI Z88.2-1969 "have the same force and effect" of the standards specifically set forth in the Occupational Safety and Health Regulations. *Id.* at §1910.6(a)(1).

### 2.  Standards for Federal Approval of Respiratory Protective Devices

Prior to 1972, the Bureau of Mines ("Bureau") promulgated the rules and regulations for the testing, permissibility, and approval of air purifying respirators under 30 C.F.R Part 14. On March 10, 1971, new approval procedures for all types of respiratory protective devices were published, and joint approval of respirators was granted to the Bureau and the National Institute for Occupational Safety and Health ("NIOSH" or "Institute"). 30 C.F.R Part 11, foreword, March 25, 1972 (hereinafter, "Part 11"). Therefore, in 1972, the Bureau and the Institute became jointly responsible for promulgating such rules and regulations.[2] The regulations pertaining to air-purifying respirators relevant to this lawsuit are contained in 30 C.F.R. Part 14 (1955) ("Schedule 21A"), 30 C.F.R. Part 14 (1965) ("Schedule 21B"), and 30 C.F.R. Part 11, subpart K (1972) ("Part 11). During the time period at issue, the relevant agencies set standards regarding the design specifications, construction, performance, packaging, instructions, and labeling of respirators. The regulations further set forth the requirements and procedure for obtaining agency approval of respiratory protective devices.

---

[1] §1910.134, was first published, and became effective, in 1971. See FR 10590-10592, May 29, 1971.
[2] Subsequently, the Mine Enforcement Safety Administration (MESA), followed by the Mine Safety Health Administration (MSHA) took over the Bureau's responsibility for respiratory protection approval. As applied to Part 11, the term "Bureau" as used herein also refers to MESA and MSHA as the Bureau's successors in the appropriate time periods. SOF ¶11

6

In order to receive approval of a respiratory protective device, and any relevant extensions of approval, the Bureau and the Institute required an application for approval. (SOF ¶13, Exhibit 1)  The agencies required that respirators be "designed, constructed, and fitted" so as to not create hazard to the wearer. *Id.* The application was required to contain detailed engineering drawings showing the full construction and all materials used in the complete respirator, as well all subassemblies and component parts *Id.* Prior to submitting an application for approval, an applicant was required to pretest its device, and submit the results of these tests along with its application. *Id.*  In addition, as a condition of approval, an applicant was required to submit details regarding its quality control and manufacturing equipment and process. *Id.* Finally, the respirators themselves were submitted for testing by the Federal government prior to receiving approval. *Id.*

The Bureau and the Institute only accepted for testing and approval respirators found to be soundly designed, constructed of suitable materials, and evidencing good workmanship. *Id.* The regulations set forth various performance and design tests that respirators were required to meet as a condition of approval, including tests specifically as to fit, filter efficiency, and inhalation resistance. Air-purifying respirators and filters were specifically tested for efficiency against silica dust. *Id.*

The Bureau and the Institute issued certificates of approval to respirators found to meet the requirements set forth in the applicable regulations. *Id.* The certificate of approval was accompanied by a list of the drawings and specifications of design upon which the certificate of approval was based. *Id.* Included with notice of approval was an approval label required to be reproduced on the container of the respirator and its filters when sold. *Id.* The approval label set forth any restrictions or limitations placed upon the use of the respirator by the Bureau and the Institute. *Id.* Use of the approval label was authorized only on respirators strictly conforming to the drawings and specifications upon which the certificate of approval was based.  *Id.* Therefore, the approval label warranted that the product was manufactured according to the terms of its approval. *Id.*

The Bureau and the Institute reserved the right to rescind, for cause, any certificate of approval. *Id.* The Bureau and the Institute also reserved the right to inspect the quality control and manufacturing process of approved respirators. *Id.* If an applicant desired to change *any* feature of a certified respirator, further application and approval by the Bureau and/or the Institute was required. *Id.*

### iii.    Federal Approval of the MSA Dustfoe 66

The MSA Dustfoe 66 is an air purifying respirator that was initially tested, certified and approved by the Bureau under Schedule 21A in 1955 and Schedule 21B in 1970. (SOF ¶¶16-17) Part 11 initially provided that "filter-type dust, fume, and mist respirators" approved under Schedule 21B would be approved for use in hazardous atmospheres[3] under Part 11 until March 30, 1974. (SOF ¶8) However, a subsequent amendment extended 21B approval of such respirators under Part 11 to September 30, 1974. (SOF ¶9) In November 1974, Part 11 was again amended to provide that filter-type dust respirators approved under 21B would remain approved until June 30, 1975 for use in hazardous atmospheres; and if purchased by June 30, 1975, until March 31, 1976. (SOF ¶¶10)

The Dustfoe 66 approved under Schedule 21B was granted an extension of approval under Part 11 on September 9, 1974. (SOF ¶18) The Dustfoe 66 was approved under Part 11 on February 21, 1975. (SOF ¶19)The Bureau and/or NIOSH reserved the right to revoke, for cause, any certificate of approval issued to the Dustfoe 66 under Schedule 21A, Schedule 21B, and Part 11. (SOF ¶¶15) The Dustfoe 66's approval was never rescinded or revoked under any of the relevant regulatory schedules.

From 1973 to 1985, the time period at issue, the OSH Act, §1910.134, and Part 11 were in effect. Therefore, if a respirator was necessary to protect Plaintiff's health, OSHA required ISP to establish and maintain a respiratory protection program and provide Plaintiff with "approved or accepted" respiratory protection against the particular hazard for which it was designed in accordance with standards established by the Bureau and NIOSH. §1910.134(a),(b)(11). A Dustfoe 66 approved under

---

[3] "Hazardous atmosphere" is defined in Part 11 as (1) Any atmosphere containing a toxic or disease producing gas, vapor, dust, fume, mist, or pesticide, either immediately or not immediately dangerous to life or health; or (2) any oxygen deficient environment.  §30 C.F.R. 11.3(r) (1974)

schedule 21B met the standards in §1910.134 and Part 11 until at least June 30, 1975, and potentially until March 31, 1976. If Plaintiff was provided with a Part 11 Dustfoe, it was approved.

Although the Bureau or NIOSH never rescinded or revoked the approval of the Dustfoe 66 under Schedule 21A or 21B, Part 11 set forth new approval requirements, and a schedule under which previously approved respirators would no longer be approved for use in hazardous atmospheres. When Part 11 became effective in 1972, the time frame under which respirators approved under Schedule 21B would remain approved for use in hazardous atmospheres was provided. As Part 11 was silent as to respirators approved under Schedule 21A, it is clear that Part 11 did not intend to extend approvals of 21A respirators for use in hazardous atmospheres. Therefore, if Plaintiff's employer provided Plaintiff with a Dustfoe approved under Schedule 21A, or a Dustfoe 66 approved under Schedule 21B purchased after June 30, 1975, such respirator was not approved for use in hazardous atmospheres under Part 11 or 1910.134. However, it was the duty of Plaintiff's employer to select the appropriate respirator for Plaintiff. MSA had no post-sale duty to warn regarding changes to the approval status of its products caused by changes and/or amendments to Federal law, under Federal or state law. *See Horstymer v. Black & Decker*, 151 F.3d 765 (8th Cir. 1998). Therefore, MSA cannot be held liable if ISP provided Plaintiff with a respirator that was not approved for conditions in which it was used.

### iv.   Pre-Market Approval of Class III Medical Devices

The process of respirator certification and approval is remarkably similar to the pre-market approval ("PMA") process of Class III medical devices set forth in the Medical Device Amendments ("MDA") of the Food, Drug and Cosmetic Act. As with the approval of respiratory protection devices, applicants seeking pre-approval of a Class III medical device submit detailed materials regarding the design, manufacture, and labeling of the device, a description of the quality assurance program, proposed labeling and product information to the Food and Drug Administration (FDA). See *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 128 S. Ct. 999, 169 L. Ed. 2d 892 (2008); *Mattingly*, 486 F.Supp.2d 964. As with approved respirators, manufacturers of devices that have received pre-market approval

9

may not make changes without the permission of the FDA. *Id.* The MDA contains an express preemption provision which prevents states from imposing requirements on medical devices that are "different from, or in addition to" those imposed by the FDCA. *Blankenship v. Medtronic*, *Inc.*, 4:13-CV-1087 CEJ, 2014 WL 1226491 (E.D.Mo. 2014). The Supreme Court, Eighth Circuit, and this Court have all held that state tort and warranty claims challenging design, labeling, manufacturing, safety and effectiveness of medical devices approved under the PMA process are preempted where they are "different from, or in addition to" the requirements of the FDA. *Brooks v. Howmedica*, 273 F.3d 785 (8th Cir. 2001); *Riegel,* 552 U.S. 312; *Mattingly*, 486 F.Supp.2d 964; *In re Medtronic, Inc., Sprint Fidelis Leads*, 623 F.3d 1200 (8th Cir. 2010); *Blankenship*, 2014 WL 1226491.

Here, the same principle applies. As discussed *supra*, if a state has not assumed responsibility for the development of occupational health and safety standards under an OSHA approved plan, and a Federal standard is in effect with respect to the issue, state claims are preempted if state law conflicts with federal law, by frustration of purpose or impossibility. Missouri has not assumed responsibility for the development and enforcement of occupational health and safety standards under an OSHA approved plan, and (as discussed below), Plaintiff's claims seek to impose requirements distinct and different from, or in addition to, the Federal requirements applicable to respiratory protection.

Notably, in considering the principles of preemption in relation to a product that had undergone the PMA process, the Eighth Circuit "recognized the need for national uniformity in product regulation". *Mattingly,* 486 F.Supp.2d at 966-967, citing *Brooks*, 273 F.3d at 797. In *Brooks*, the Eighth Circuit specifically noted that the reason the preemption provision was included in the MDA is "if a substantial number of differing requirements applicable to a medical device are imposed by jurisdictions other than the Federal government, interstate commerce would be unduly burdened." *Brooks*, 273 F.3d at 797 (internal citations and quotations omitted). That is exactly the case here. When it enacted the OSH Act, Congress specifically stated that it did so in part under its power to regulate commerce.  While a state may submit a plan for the development of occupational safety and health

standards for Federal approval, any standards applicable to products distributed or used in interstate commerce which are distinct or different from Federal standards shall not be approved unless such standards 1) are required by compelling local conditions, and 2) do not unduly burden interstate commerce. This dual-pronged requirement clearly shows that Congress recognized the need for national uniformity in occupational safety and health products, as well as the undue burden that differing standards imposed by jurisdictions other than the Federal government would have on such products. Therefore, states are preempted from imposing such standards without Federal approval.

**v.    Plaintiff's Claims are Preempted because they Frustrate the Purpose of Federal Law**

Specifically, Plaintiff alleges that Dustfoe failed to comply with Federal certification. However, MSA received Federal approvals for the Dustfoe 66 by the relevant Federal agencies pursuant to the applicable regulations. (SOF ¶¶16-19) Those approvals were granted based on the fact that the design, construction, materials, performance, testing, and manufacturing and quality control processes of the Dustfoe 66 met all the Federal requirements. (SOF ¶13, Exhibit 1) The Federal government was free to revoke the approvals and/or any extension of approvals granted to the Dustfoe 66 at any time if the Dustfoe 66 no longer complied with the conditions of its approval, or if MSA failed to manufacture the Dustfoe 66 pursuant to the exact specifications of its approval. *Id.*  However, the approvals granted to the Dustfoe 66 were never rescinded or revoked. Moreover, a Dustfoe 66 was approved for use in hazardous environments during the entire time period at issue. (SOF ¶¶16-19)

Plaintiff alleges that the Dustfoe failed to protect or was ineffective in protecting against silica dust, and that MSA knew or should have known and failed to warn of the same. (SOF ¶2d) Plaintiff further alleges that MSA Dustfoe could not be properly fitted, and that MSA knew and failed to warn of the same. (SOF ¶2d)  However, the Dustfoe 66 was tested and approved by the Bureau and/or the Institute for protection against dust, including silica dust. (SOF ¶13, Exhibit 1, ¶¶16-19) As part of the approval process, the Dustfoe and its filters were subject to rigorous testing by both MSA and the relevant agencies, including silica dust tests. (SOF ¶13, Exhibit 1) The regulations also set forth

11

requirements regarding fit, and respirator fit was tested as part of the approval process. *Id.* Likewise, Plaintiff alleges that the Dustfoe failed to instruct in proper use. (SOF ¶2a) As to this claim and Plaintiff's claims of failure to warn, the Federal government specifically provided the design of the approval label along with any notice of approval. (SOF ¶¶13, Exhibit 1B) The approval label was required to be reproduced on the respirator and filter packaging. *Id.* The relevant regulations required that such approval label set forth any required restrictions, limitations, caution statements, and instructions for use of the respirator. *Id.*

Plaintiff alleges that MSA failed to implement or enforce a valid quality control program, and ignored the results of quality controls tests, failed to perform adequate filtering tests of the Dustfoe respirators before they were sold, and/or ignored the results of filtering tests. (SOF ¶2c,f,g) The Federal regulations set forth detailed requirements for the testing of filters, component parts, complete respirators, and the development of quality controls plans. (SOF ¶13, Exhibit 1) Not only was such information reviewed as part of the approval process, but the Federal government retained regulatory oversight over the manufacturing and quality control of approved respirators, and had the right to revoke approval at any time if it was determined that the Dustfoe 66 was not being manufactured under the terms of approval or MSA was not following the approved quality control plan. *Id.* The Federal regulations required MSA to test each lot of its filter materials and complete respirators before marketing. *Id.* MSA's pre-market quality control testing procedures were reviewed and approved by the agencies as part of the approval process. *Id.* The agencies reserved the right to inspect MSA's quality control records and equipment, as well as interview MSA personnel regarding quality control at any time post-approval. *Id.* The use of an approval label was authorized only on respirators conforming to the specifications and terms of approval, and approval could be rescinded at any time. *Id.*

In a related vein, Plaintiff alleges that MSA breached its warranty that the Dustfoe would provide proper filtration and was fit for a particular purpose. (SOF ¶2h) Under the applicable regulations, the use of an agency issued approval label warranted that the respirator was manufactured according to the

terms of its approval. (SOF ¶13, Exhibit 1B)  And, by definition, the approval label warranted that the respirator had been approved by the agency for a particular purpose. *Id.*

Cleary, Plaintiff's claims seek to impose standards or requirements on the Dustfoe 66 distinct and different from the requirements and standards that MSA and the Dustfoe were required to meet, and did meet, under the applicable Federal standards. Allowing Missouri law to impose different standards would frustrate Congressional intent under the OSH Act to ensure national uniformity in occupational safety and health products distributed or used in interstate commerce, and to not unduly burden interstate commerce by subjecting product manufacturers to differing standards in various jurisdictions. Therefore, Plaintiff's claims are pre-empted.

Finally, in his negligence *per se* claim, Plaintiff alleges that MSA violated federal regulations, specifically 30 U.S.C. 820(f), 30 U.S.C. 820(h), and 30 C.F.R. 11.140-10, "intended to protect the class of persons working in mining and/or silica dust producing operations". (Doc. #1, Count VIII-negligence per se). 30 C.F.R. 11.140-10 provides the standards for exhalation valve leakage tests and minimum requirements for certification of air-purifying respirators under Part 11.  30 U.S.C. 820(f) and (h) and provide for penalties that may be imposed for making false statements or representations under the Mine Safety Health Act. Plaintiff fails to state specifically how MSA violated these regulations other than "by falsely representing that the Dustfoe 66 was in compliance with federal regulations." The Federal government approved the Dustfoe 66, and therefore MSA was not in violation of 30 CFR 11.140-10. *See Scaggs v. 3M*, 4:08CV01161 ERW, 2010 WL 3943631 (E.D. Mo 2010); *Firebaugh v. 3M*, 4:08CV01163 ERW, 2010 WL 3942005 (E.D. Mo 2010); *Midkiff v. 3M,* 4:08CV01219 ERW, 2011 WL 181318 (E.D.Mo 2011) (all denying plaintiffs' motions for partial summary judgment based on negligence *per se*.  Plaintiffs' motions argued that the Dustfoe failed to comply with Federal regulations.) MSA made no false representations by relying on approvals granted and never rescinded.  As this claim also seeks to impose requirements different from the Federal requirements, it is also preempted.

**vi.    Plaintiff's Claims are Preempted Even if ISP is Subject to MSHA Jurisdiction**

While Plaintiff's Complaint does not allege that ISP is (or was) a mine, Plaintiff's negligence *per se* claim alleges that MSA violated provisions of the Mine Safety and Health Act ("Mine Act"). Therefore, Plaintiff may argue that his employer was subject safety and health regulations applicable to mining operations rather than the OSH Act. Even if that is the case, the Federal Coal Mine Safety and Health Act of 1969 ("Coal Act") and the Mine Act both required employers to provide federally approved respirators when respiratory protection was required. (SOF ¶¶21-26) Moreover, even if the Mine Act applies, Plaintiff's claims are still preempted. The Mine Safety and Health Administration, the agency responsible for promulgating regulations under the Mine Act, is an agency of the Department of Labor. (SOF ¶25) The OSH Act applies to the working conditions of all employees over which the Department of Labor exercises statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health. 29 U.S.C.A. §653(b)(1); 29 CFR §1910.5. Therefore, the respiratory protection standard of 29 CFR 1910.134 and the preemption principles of the OSH Act apply with the same force and effect regardless of whether the Mine Act applies.

**c. Even if Plaintiff's Claims are Not Preempted, Plaintiff Fails to State a Claim on Which Relief Can be Granted Under Missouri Law**

**i.    The Dustfoe was Not Unreasonably Dangerous**

Under Missouri law of products liability, a plaintiff must show that the product was unreasonably dangerous when put to its intended use. *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 377 (Mo.1986) (en banc); *Sandage v. Bankhead Enterprises, Inc.,* 177 F.3d 670, 675 (8th Cir. 1999). While the question of whether a product is unreasonably dangerous is ordinarily a question for the jury, a court can declare that a product is not unreasonably dangerous as a matter of law. *Id.*

As discussed at length, the Dustfoe 66 was tested and approved by the relevant agencies. At no time was any approval revoked. Plaintiff's claims that the Dustfoe was unreasonably dangerous are all

14

based on features of the Dustfoe that were specifically reviewed and approved. For the reasons set forth herein, as a matter of law, the Dustfoe was not unreasonably dangerous.

### ii.    Plaintiff's Breach of Warranty Claim is Barred by the Statute of Limitations

Under Missouri law, a breach of warranty action must be commenced within four years of the date of product delivery. RSMo. §400.2-725 (2000). Plaintiff's Complaint was filed on April 25, 2014. In order to have a viable cause of action for breach of warranty, the Dustfoe respirators at issue would have had to have been delivered on or after April 25, 2010. Plaintiff stopped working at ISP nearly 30 years ago. Therefore Plaintiff's claim for breach of warranty is barred. *See Buttice v. G.D. Searle & Co.*, 938 F.Supp. 561 (E.D. Mo. 1996) (claim barred where product delivered 19 years before suit)

### iii.    Plaintiff Cannot Prevail on his Negligence *Per Se* Claim

To establish negligence *per se*, a plaintiff must allege and establish a violation of a statute. *Sill v. Burlington Northern,* 87 S.W.3d 386, 392 (Mo.App. S.D. 2002). "Negligence *per se* arises when the legislature pronounces in a statute what the conduct of a reasonable person must be, whether or not the common law would require similar conduct, and the court then adopts the statutory standard of care to define the standard of conduct." *Burns v. Frontier II,* 106 S.W.3d 1, 3 (Mo.App.E.D. 2003).

As discussed *supra*, Plaintiff alleges that MSA violated 30 U.S.C. 820(f), 30 U.S.C. 820(h), and 30 C.F.R. 11.140-10. These statutes do not define a standard of care. Moreover, a negligence *per se* claim fails without evidence of a violation of precise statutory requirements. *In re Genetically Modified Rice Litigation*, 666 F.Supp.2d 1004 (E.D.Mo 2009). Plaintiff has provided no evidence of how MSA has violated these provisions. To the contrary, the MSA Dustfoe 66 respirator was certified and approved during the entire time period at issue.

## IV.    CONCLUSION

WHEREFORE, for the reasons set forth herein, Defendant Mine Safety Appliances Company prays that Plaintiff's Complaint be dismissed, and for all other relief to which it may be entitled.

15

Respectfully submitted by

**SmithAmundsen, LLC**

/s/ Anne E. Bode
W. Jeffrey Muskopf - #71431
Anne E. Bode - #61222
120 S. Central Ave., Suite 700
St. Louis, Missouri 63105
Telephone:  (314) 719-3746
Facsimile:   (314) 719-3759
jmuskopf@salawus.com
abode@salawus.com

ATTORNEYS FOR DEFENDANT MINE SAFETY
APPLIANCES COMPANY

## PROOF OF SERVICE

I hereby certify that on June 19, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Anne E. Bode

16